## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:16cv21121

| | |
|---|---|
| VICTIM | : |
| | : |
| Plaintiff, | : |
| vs. | : |
| | : |
| OUR KIDS OF MIAMI-DADE/MONROE, | : |
| INC., WESLEY HOUSE FAMILY | : |
| SERVICES, INC., and FLORIDA KEYS | : |
| CHILDREN'S SHELTER, INC. | : |
| | : |
| Defendants. | : |

_____/

### COMPLAINT

The Plaintiff, VICTIM, by and through undersigned counsel, hereby sues the Defendants,

OUR KIDS OF MIAMI-DADE/MONROE, INC., WESLEY HOUSE FAMILY SERVICES,

INC., and FLORIDA KEYS CHILDREN'S SHELTER, INC., and alleges:

### JURISDICTION

1.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, as an action

brought pursuant to 42 U.S.C. § 1983, and pursuant to 28 U.S.C. § 1331, as a case brought pursuant

to the Constitution and the laws of the United States.  The Court has pendent jurisdiction over

Plaintiff's state law claims arising under the laws of Florida.

### THE PARTIES

2.     At all times material hereto, Plaintiff (hereinafter "VICTIM"), whose date of birth

is March 11, 1995, was a minor foster child in the legal and physical custody of the State of Florida

Department of Children and Families (hereinafter the "Department"), OUR KIDS OF MIAMI-

DADE/MONROE, INC., (hereinafter "OUR KIDS") and  WESLEY HOUSE FAMILY

SERVICES, INC., (hereinafter "WESLEY HOUSE"), and at times material hereto was in the physical custody of FLORIDA KEYS CHILDREN'S SHELTER, INC. (hereinafter "FKCS").

3.      Due to the nature of the allegations as set forth herein below, VICTIM is using a pseudonym as she became a victim of sexual trafficking and sexual abuse.

4.      Defendant, OUR KIDS is a Florida Corporation operating its business in Miami-Dade and Monroe Counties, Florida.

5.      At all times material hereto, OUR KIDS was the lead agency for community-based care in Miami-Dade and Monroe Counties, Florida pursuant to § 409.1671, Florida Statutes, and contracted with the Department to provide foster care and related services to children in the custody of the State of Florida, including VICTIM.

6.      At all times material hereto, OUR KIDS was an independent contractor of the Department with regard to its duty to operate the system of foster care and related services for children in Miami-Dade and Monroe Counties, including providing an appropriate system of care and placements.

7.      At all times material hereto, OUR KIDS subcontracted out the provision of case management services in Miami-Dade and Monroe Counties.

8.      Defendant, WESLEY HOUSE is a Florida Corporation operating its business in Monroe County, Florida.

9.      At all times material hereto, WESLEY HOUSE contracted with OUR KIDS pursuant to § 409.1671, Florida Statutes, to provide foster care and related services, including, but not limited to, case management services, to children in the custody of the State of Florida, including VICTIM.

2

10.     At all times material hereto, WESLEY HOUSE was an independent contractor of OUR KIDS with regard to its duty to provide case foster care and related services, including case management services, to children in Monroe County.

11.     At all times material hereto, OUR KIDS was required to monitor the performance of WESLEY HOUSE regarding the provision of case management services to ensure compliance with all Florida Statutes, Florida Administrative Code rules, Department Operating Procedures, OUR KIDS Policies and Procedures, WESLEY HOUSE Policies and Procedures, and the common law, to ensure the health, welfare, and safety of children in the custody of the State of Florida, including VICTIM.

12.     Defendant, FKCS, is a Florida corporation operating its business in Monroe County, Florida.

13.     At all times material hereto, FKCS contracted with OUR KIDS and/or WESLEY HOUSE pursuant to § 409.1671, Florida Statutes, to provide foster care and related services, including, but not limited to, emergency shelter services to minor children in the legal and physical custody of the State of Florida.

14.     At all times material hereto, FKCS operated the Jelsema Residential Program and/or Jelsema Center and/or Jelsema Emergency Shelter (hereinafter "JELSEMA"), located in Tavernier, Monroe County, Florida, which was licensed to provide 24-hour intake and awake supervision for eighteen (18) children between the ages of ten (10) and seventeen (17).

15.     At all times material hereto, FKCS was an independent contractor of OUR KIDS and/or WESLEY HOUSE with regard to its provision of emergency shelter services and operation of JELSEMA.

16.     At all times material hereto, OUR KIDS and/or WESLEY HOUSE were continually required to monitor the performance of FKCS regarding the provision of emergency shelter services to ensure compliance with all Florida Statutes, Florida Administrative Code rules, Department Operating Procedures, OUR KIDS Policies and Procedures, WESLEY HOUSE Policies and Procedures, FKCS Policies and Procedures, and the common law, to ensure the health, welfare, and safety of children in the custody of the State of Florida, including VICTIM.

17.     Pursuant to the contractual arrangements between the Defendants, at all times material hereto, OUR KIDS, WESLEY HOUSE, and FKCS,  through their agents and employees, were not acting as officers, employees, or agents of the State of Florida for purposes of § 768.28, Florida Statutes.

## GENERAL ALLEGATIONS

18.     OUR KIDS has operated a system of care in Miami-Dade and Monroe Counties with known, significant systemic and widespread problems and dangers that have caused harm to and endangered children in the care and custody of the State of Florida, including VICTIM, by:

     a.   Failing to appropriately assess risk of children who came into its care and custody on a timely basis;

     b.   Failing to appropriately case manage these cases by delegating all responsibilities to its subcontractors, including WESLEY HOUSE, without sufficient direct case supervision and monitoring that would be necessary to meet its constitutional and statutory duties to provide for the safety of children;

     c.   Failing to take appropriate safety precautions, including the implementation of safety plans to prevent elopement and runaway episodes, for children in foster care;

4

d.   Failing to appropriately assess children for critically needed mental health services;

e.   Failing to obtain or facilitate access to mental health services for children with assessed mental health needs in a timely manner in accordance with professional judgment;

f.   Failing to obtain or facilitate access to substance abuse services for children with assessed substance abuse needs in a timely manner in accordance with professional judgment;

g.   Failing to obtain safe and appropriate out-of-home placements available to meet the needs of children in its care and custody in a timely manner;

h.   Failing to ensure children in out-of-home care received safety and stability in their placements;

i.   Failing to ensure that foster children receive appropriate mental health services and placements in a timely manner;

j.   Failing to assess foster children for secure residential placement when required; and

k.   Failing to monitor its subcontractors to identify dangers in the child welfare system of care in Miami-Dade and Monroe counties and take necessary corrective action.

19.   On or about March 30, 2012, VICTIM was placed in the custody of the State of Florida pursuant to a Shelter Petition that alleged, among other things, that: VICTIM's mother reported VICTIM was ungovernable; a runaway; truant; had a serious drug problem; had been aggressive; had stolen from the mother resulting in DJJ charges; was severely emotionally

5

disturbed and had been Baker Acted pursuant to Chapter 394, Florida Statutes, most recently due to attempting to jump out of the car twice while in transit to FKCS JELSEMA and threatening suicide in the FKCS JELSEMA parking lot when her mother attempted to admit her under a CINS/FINS admission; and that VICTIM had been the subject of Marchman Act proceedings pursuant to Chapter 397, Florida Statutes, to assess her for substance abuse problems, was being discharged from the Juvenile Addiction Receiving Facility (hereinafter JARF") that evaluated her pursuant to the Marchman Act order, and her parents stated they were unable to control VICTIM's behavior and were unable and unwilling to pick her up from the JARF facility.

20.     On or about March 30, 2012, VICTIM was placed in the care and custody of OUR KIDS to provide foster care and related services.

21.     On or about March 30, 2012, OUR KIDS' Intake Department accepted VICTIM's case for services and was responsible for assisting in the decision about the best course of action for VICTIM, escalating VICTIM's case internally if there was concern for her safety and well-being, completing an initial Intake Assessment, completing a final Intake Assessment, reviewing all documents and information available for VICTIM, and making recommendations with respect to appropriate services and placement needs.

22.     On or about March 30, 2012, OUR KIDS assigned VICTIM's case to WESLEY HOUSE, and WESLEY HOUSE began providing protective supervision case management services to VICTIM.

23.     On or before March 30, 2012, OUR KIDS, WESLEY HOUSE, and FKCS had knowledge that VICTIM had serious medical and mental health needs and that she had a history of mental health issues and diagnoses, suicidal ideations and attempts, homicidal ideations, Baker Acts, a Marchman Act, a prior CINS/FINS placement at FKCS JELSEMA, elopement episodes,

6

truancy, sexual abuse victimization, sexual activity with adult males, juvenile delinquency charges, and substance abuse issues, and that VICTIM required placement in a residential substance abuse program as recommended by her Marchman Act evaluation to meet her treatment needs and ensure her safety.

24.     On or about March 30, 2012, OUR KIDS and/or WESLEY HOUSE authorized placement of VICTIM, FKCS JELSEMA, an emergency shelter that did not provide any mental health services to meet VICTIM's needs. WESLEY HOUSE then transported VICTIM to FKCS JELSEMA, and FKCS admitted VICTIM to FKCS JELSEMA.

25.     On or about March 30, 2012, OUR KIDS, WESLEY HOUSE, and FKCS had knowledge that FKCS JELSEMA could not meet VICTIM's immediate need for protection and safety and that VICTIM needed a higher level of mental health care than the FKCS JELSEMA shelter could provide.

26.     OUR KIDS, WESLEY HOUSE, and FKCS were required to ensure VICTIM received immediate mental health, substance abuse, and behavioral health services, including, but not limited to, assessment and evaluation, individual counseling, psychiatric care, and substance abuse treatment to address her known serious medical, mental health, and substance abuse needs, but they failed to do so.

27.     At all times material hereto, OUR KIDS was the central Point of Contact for WESLEY HOUSE in referring children for Level of Care Assessments and accessing other behavioral health assessments and mental health services as needed.

28.     At all times material hereto OUR KIDS was required to:

    a.  Provide consultation to WESLEY HOUSE in accessing screening for mental health and any co-occurring substance abuse problems, professional

assessments, and timely treatment at levels appropriate to the condition and severity of the child for children in out-of-home care;

b.   Manage the referral, quality, and tracking of Level of Care Assessments;

c.   Serve as a consultant to WESLEY HOUSE in making timely, appropriate, and effective referrals to mental health, behavioral, substance abuse, and co-occurring substance abuse services;

d.   Provide assistance to WESLEY HOUSE in obtaining clinical case consultation for especially complex cases;

e.   Manage the multi-disciplinary staffing process for placement in Specialized Therapeutic Foster Care and Specialized Therapeutic Group Care; and

f.   Manage the process of referring children for initial Suitability Assessments for residential treatment facilities.

29.   OUR KIDS was the Point of Contact for all behavioral and mental health services and had knowledge of VICTIM's serious medical and mental health needs, but failed to take any action to ensure VICTIM received necessary treatment and a safe placement.

30.   OUR KIDS was authorized to have a Level of Care Assessment performed for VICTIM within seven (7) calendar days after she was placed in shelter care and should have ensured VICTIM received a Level of Care Assessment immediately due to her serious medical and mental health needs, but it failed to do so.

31.   The purpose of the Level of Care Assessment was to, *inter alia*, provide recommendations for treatment and placement based upon professional judgment.

32.   Upon information and belief, on or about March 30, 2012, OUR KIDS assigned VICTIM an "Intake" Level of Care, which is the level of care assigned to all children following

placement into foster care, despite knowledge of VICTIM's serious medical, mental health, behavioral, and substance abuse needs.

33.     OUR KIDS had the authority and ability to assign VICTIM to a temporary Level of Care 2 on an emergency basis due to her need for enhanced services and her exhibiting externalizing behaviors which required enhanced support and linkage for services; however OUR KIDS failed to change VICTIM's level of care and failed to ensure she received necessary treatment and services to ensure her safety.

34.     OUR KIDS was required to conduct a Level of Care staffing for VICTIM within thirty (30) days of her placement in shelter status to determine her final level of care, but it failed to do so.

35.     WESLEY HOUSE had the authority and ability to request a review of VICTIM's assigned level of care when her behavior or needs had changed so dramatically that it was incumbent upon OUR KIDS to reconsider the current level of care; however, WESLEY HOUSE failed to request OUR KIDS to change VICTIM's level of care to appropriately meet her needs.

36.     On or about April 1, 2012, OUR KIDS, WESLEY HOUSE, and FKCS had knowledge that VICTIM made suicidal ideations while at FKCS JELSEMA, but OUR KIDS, WESLEY HOUSE, and FKCS failed to have her Baker Acted to meet her serious medical, mental health, and treatment needs and to ensure her safety.

37.     On or about April 10, 2012, eleven (11) days after being placed in shelter care, OUR KIDS finally referred VICTIM for a Level of Care Assessment.

38.     At all times material hereto, OUR KIDS, WESLEY HOUSE, and FKCS had knowledge that children placed at FKCS JELSEMA had unsupervised access to cell phones and used cell phones to plan their elopement from FKCS JELSEMA.

39.     On or about April 10, 2012, OUR KIDS, WESLEY HOUSE, and FKCS had knowledge that VICTIM ran away from FKCS JELSEMA.

40.     On or about April 11 2012, when VICTIM was recovered from runaway status, OUR KIDS and/or WESLEY HOUSE authorized placement of VICTIM back at FKCS JELSEMA, WESLEY HOUSE transported VICTIM back to FKCS JELSEMA, and FKCS admitted VICTIM back to FKCS JELSEMA despite knowledge that FKCS JELSEMA could not meet VICTIM's serious medical and mental health needs, immediate need for protection and safety, and that VICTIM needed a higher level of care than FKCS JELSEMA could provide.

41.     Upon recovering VICTIM from runaway status, OUR KIDS, WESLEY HOUSE, and FKCS were required to staff VICTIM's case to determine the need for further services and/or change in placement and to refer VICTIM for a mental health evaluation and substance abuse assessment, but they failed to do so.

42.     On or about April 16, 2012, OUR KIDS, WESLEY HOUSE, and FKCS had knowledge that VICTIM ran away from FKCS JELSEMA for the second time.  VICTIM was returned to FKCS JELSEMA shortly after she was discovered missing.  OUR KIDS, WESLEY HOUSE, and FKCS were required to staff VICTIM's case to determine the need for further services and/or change in placement and to refer VICTIM for a mental health evaluation and substance abuse assessment, but they failed to do so.

43.     On or about April 17, 2012, WESLEY HOUSE requested that OUR KIDS facilitate a Multi-Disciplinary Team Staffing for VICTIM.

44.     On or about April 20, 2012, WESLEY HOUSE sent OUR KIDS a referral for Initial Suitability Assessment requesting that VICTIM be placed in residential treatment for, *inter alia*,

10

stabilization of her behaviors and to address co-occurring mental health and substance abuse issues.

45.     On or about April 23, 2012, a Multi-Disciplinary Team staffing was scheduled to take place with OUR KIDS, WESLEY HOUSE, Agency for Healthcare Administration (hereinafter "AHCA"), and Miami-Dade County School District to discuss services and placement for VICTIM, but WESLEY HOUSE failed to appear for the meeting so OUR KIDS put the Multi-Disciplinary Team staffing on hold until further notice from WESLEY HOUSE.  OUR KIDS had the ability and authority to refer VICTIM for appropriate services and placement without the participation of WESLEY HOUSE, but failed to do so.

46.     On or about April 24, 2012, OUR KIDS, WESLEY HOUSE, and FKCS had knowledge that VICTIM had again made suicidal ideations at FKCS JELSEMA; however, OUR KIDS, WESLEY HOUSE, and FKCS failed to have her Baker Acted to address her serious medical and mental health needs and to ensure her safety.

47.     On or about April 26, 2012, OUR KIDS, WESLEY HOUSE, and FKCS had knowledge that VICTIM ran away from FKCS JELSEMA for the third time.  VICTIM was inappropriately returned to FKCS JELSEMA shortly after she was discovered missing.  OUR KIDS, WESLEY HOUSE, and FKCS were required to staff VICTIM's case to determine the need for further services and/or change in placement and to refer VICTIM for a mental health evaluation and substance abuse assessment, but they failed to do so.

48.     Further, after VICTIM ran away from care for the third time, she was considered a habitual runaway and OUR KIDS and WESLEY HOUSE were required to refer VICTIM for a behavioral review or a comprehensive behavioral assessment by a Certified Behavior Analyst or Certified Associate Behavioral Analyst to develop an individualized plan for the prevention of

continued runway behavior, but they failed to do so on this occasion and after subsequent runaway episodes.

49.    On or about May 3, 2012, OUR KIDS, WESLEY HOUSE, and FKCS had knowledge that VICTIM ran away from FKCS JELSEMA for the fourth time.  VICTIM was inappropriately returned to FKCS JELSEMA shortly after she was discovered missing as the shelter had not and could not address VICTIM's mental health needs.  OUR KIDS, WESLEY HOUSE, and FKCS were required to staff VICTIM's case to determine the need for further services and/or change in placement and to refer VICTIM for a mental health evaluation and substance abuse assessment, but they failed to do so.

50.    On or about May 4, 2012, thirty-five (35) days after VICTIM was inappropriately placed in the FKCS JELSEMA emergency shelter care and five (5) days after OUR KIDS was required to have a staffing regarding her level of care, VICTIM finally received a Level of Care Assessment.

51.    On or about May 4, 2012, OUR KIDS,WESLEY HOUSE, and FKCS received a copy of VICTIM's Level of Care Assessment which put them on notice that based on VICTIM's high-risk behaviors, psychological needs, and risk of self-harm, VICTIM needed to be placed in a secure structured therapeutic setting to maintain her safety while she begins to address her mental health needs, that based on VICTIM's current high-risk behaviors, a less restrictive environment would not ensure her safety, and that the evaluator was concerned that as VICTIM continued to be placed at FKCS JELSEMA, a non-secure setting, she was at significant risk of sexual exploitation and harm.

52.    The Level of Care Assessment also put OUR KIDS, WESLEY HOUSE, and FKCS, on notice that in addition to a secure residential placement, VICTIM needed individual therapy

services with a clinician who was familiar with working with children with significant behavioral and psychological issues; psychiatric services to address non-compliance with psychotropic medication; Targeted Case Management to assist her in linkages to mental health, psychiatric, and educational services; substance abuse services; and anger management services to increase her impulse control and modulation of her anger.

53.     OUR KIDS, WESLEY HOUSE, and FKCS failed to ensure VICTIM received any of the recommendations based upon professional judgment set forth in the Level of Care Assessment.

54.     On or about May 4, 2012, WESLEY HOUSE and FKCS had knowledge that VICTIM said she was going to continue running away as long as she remained placed at FKCS JELSEMA, yet they allowed VICTIM to remain at the unsecure emergency shelter where she could not be protected from harm and did not receive mental health services based upon professional judgment.

55.     On or about May 4, 2012, OUR KIDS, WESLEY HOUSE, and FKCS had knowledge that VICTIM ran away from FKCS JELSEMA for the fifth time.

56.     On or about May 5, 2012, VICTIM was found in Miami, FL with known criminals, and OUR KIDS, WESLEY HOUSE, and FKCS allowed VICTIM to be returned to FKCS JELSEMA where she could not be protected from harm.

57.     On or about May 7, 2012, thirty-eight (38) days after OUR KIDS and WESLEY HOUSE began providing services to VICTIM and had knowledge of VICTIM's serious medical and mental health needs and her immediate need for residential placement, VICTIM received an Initial Suitability Assessment to determine whether she met the criteria for residential placement.

58.     On or about May 7, 2012, OUR KIDS, WESLEY HOUSE, and FKCS, received a copy of VICTIM's Initial Suitability Assessment which again put them on notice that VICTIM was at high risk of engaging in substance abuse as well as chaotic, impulsive and reckless behavior that was self-endangering and potentially self-exploitive and that VICTIM had poor insight and little ability to protect herself in relationships with others.

59.     The Initial Suitability Assessment also put OUR KIDS, WESLEY HOUSE, and FKCS on notice that based upon professional judgment VICTIM met the criteria for placement in a locked psychiatric residential treatment program, that she must be placed in a highly structured, closely supervised intensive therapeutic program to meet her significant mental health needs, that a less restrictive level of care such as FKCS JELSEMA would leave VICTIM at risk of running away, engaging in self-injury, and seeking stimulation that is potentially harmful to herself, and it was recommended that VICTIM be placed in a psychiatric residential services facility licensed under Chapter 395, Fla. Stat., or Chapter 65E-9 F.A.C., that was not a Specialized Therapeutic Group Home.

60.     Despite being on notice from the Level of Care Assessment and the Initial Suitability Assessment that VICTIM required secure residential placement to keep her safe from harm and exploitation, OUR KIDS, WESLEY HOUSE, and FKCS allowed VICTIM to continue to be placed at FKCS JELSEMA, a facility that could not meet her immediate need for protection and safety and mental health needs based upon professional judgment.

61.     On or about May 8, 2012, OUR KIDS, WESLEY HOUSE, and FKCS had knowledge that VICTIM ran away from FKCS JELSEMA for the sixth time.  VICTIM and another resident at FKCS JELSEMA were inappropriately allowed access to use a cell phone to contact someone to pick them up from FKCS JELSEMA prior to running away.

14

62.     On or about May 9, 2012, forty (40) days after VICTIM was placed in state custody, and ten (10) days after it was required to do so, OUR KIDS held a Level of Care staffing, retroactively placing VICTIM on a Level of Care 2 between March 30, 2012, and May 9, 2012, and assigning her to a Level of Care 3 as of May 9, 2012 due to VICTIM's need for enhanced supervision because of her at risk behaviors at home, school, and in the community, her significant deteriorating mental health needs, her significant behavioral needs, and her exhibiting significant externalizing behaviors with required intensive service delivery and/or wraparound services.

63.     Despite the change in her level of care, OUR KIDS, WESLEY HOUSE, and FKCS, failed to ensure VICTIM received any necessary and recommended services based upon professional judgment to meet her serious medical and mental health needs, including, but not limited to, individual therapy, targeted case management, substance abuse treatment, and safe, secure residential placement.

64.     On or about May 10, 2012, when VICTIM was returned to their custody, OUR KIDS and/or WESLEY HOUSE again authorized placement of VICTIM back at FKCS JELSEMA, WESLEY HOUSE transported VICTIM back to FKCS JELSEMA, and FKCS admitted VICTIM back to FKCS JELSEMA yet again despite knowledge that VICTIM required secure residential placement to keep her safe from harm and exploitation and that FKCS JELSEMA could not meet her immediate need for protection and safety and her mental health needs based upon professional judgment.  OUR KIDS, WESLEY HOUSE, and FKCS were required to staff VICTIM's case to determine the need for further services and/or change in placement, refer VICTIM for a mental health evaluation and substance abuse assessment, refer VICTIM for a behavioral review or a comprehensive behavioral assessment by a Certified Behavior Analyst or Certified Associate Behavioral Analyst to develop an individualized plan for

the prevention of continued runway because she was considered a habitual runaway, but they failed to do so.

65.     On or about May 11, 2012, seven (7) days after OUR KIDS and WESLEY HOUSE had knowledge of the Level of Care recommendations and four (4) days after OUR KIDS and WESLEY HOUSE had knowledge of the professional judgment contained in the Initial Suitability Assessment recommendations, a motion to place VICTIM in a secure psychiatric residential treatment program that would provide treatment was filed with the dependency court.

66.     On or about May 11, 2012, FKCS finally referred VICTIM for counseling and therapy, but she was placed on a waiting list.

67.     On or about May 14, 2012, WESLEY HOUSE and FKCS had knowledge that VICTIM said she was going to continue running away as long as she remained placed at FKCS JELSEMA and that her mental health condition continued to deteriorate, yet they allowed VICTIM to remain at the unsecure emergency shelter where she could not receive necessary mental health services based upon professional judgment and could not be protected from harm and exploitation.

68.     On or about May 22, 2012, the dependency judge ordered that VICTIM be placed in a psychiatric residential services facility licensed under chapter 395, Fla. Stat., or 65E-9 F.A.C. that is not a specialized therapeutic group home (SIPP Placement) "INSTANTER."

69.     On or about May 22, 2012, OUR KIDS, WESLEY HOUSE, and FKCS had knowledge that VICTIM ran away for the seventh time, this time from the court house during the dependency court hearing.

70.     When VICTIM was recovered from runaway by WESLEY HOUSE on May 22, 2012, OUR KIDS and/or WESLEY HOUSE authorized placement of VICTIM back at FKCS JELSEMA, WESLEY HOUSE transported VICTIM back to FKCS JELSEMA, and FKCS

16

admitted VICTIM back to FKCS JELSEMA yet again despite knowledge that she was deteriorating and that it was contrary to professional judgment and in direct violation of the judge's order to immediately ensure VICTIM was placed in a secure residential facility that could meet her immediate need for protection and safety. OUR KIDS, WESLEY HOUSE, and FKCS were required to staff VICTIM's case to determine the need for further services and/or change in placement, refer VICTIM for a mental health evaluation and substance abuse assessment, refer VICTIM for a behavioral review or a comprehensive behavioral assessment by a Certified Behavior Analyst or Certified Associate Behavioral Analyst to develop an individualized plan for the prevention of continued runway because she was considered a habitual runaway, but they again failed to do so.

71.     On or about May 23, 2012, VICTIM attempted to run away from FKCS JELSEMA.

72.     On or about May 25, 2012, VICTIM attempted to run away from FKCS JELSEMA.

73.     On or about May 28, 2012, VICTIM and other residents at FKCS JELSEMA were seen using a cell phone making calls to men to get picked up to run away from FKCS JELSEMA.

74.     On or about May 29, 2012, WESLEY HOUSE had knowledge that VICTIM said she was going to run away from FKCS JELSEMA, yet it allowed VICTIM to remain at the unsecure emergency shelter where she could not be protected from harm and exploitation.

75.     On or about May 29, 2012, OUR KIDS, WESLEY HOUSE, and FKCS had knowledge that VICTIM ran away for the eighth time. VICTIM was returned to FKCS JELSEMA shortly after she was discovered missing. OUR KIDS, WESLEY HOUSE, and FKCS were required to staff VICTIM's case to determine the need for further services and/or change in placement, refer VICTIM for a mental health evaluation and substance abuse assessment, refer VICTIM for a behavioral review or a comprehensive behavioral assessment by a Certified

Behavior Analyst or Certified Associate Behavioral Analyst to develop an individualized plan for the prevention of continued runway because she was considered a habitual runaway, but they failed to do so.

76.    Each and every time VICTIM was recovered from runaway, OUR KIDS, WESLEY HOUSE, and FKCS were required to staff VICTIM's case to determine the need for further services and/or change in placement and to refer VICTIM for a mental health evaluation and substance abuse assessment, but they failed to do so.

77.    Each and every time VICTIM was recovered from runaway after her third elopement, OUR KIDS and WESLEY HOUSE were require to refer VICTIM for a behavioral review or a comprehensive behavioral assessment by a Certified Behavior Analyst or Certified Associate Behavioral Analyst to develop an individualized plan for the prevention of continued runway because she was considered a habitual runaway, but they failed to do so.

78.    On or about May 29, 2012, WESLEY HOUSE and FKCS had knowledge that VICTIM used a cell phone to make suicidal and homicidal threats, but WESLEY HOUSE and FKCS failed to have her Baker Acted to meet her serious medical and mental health needs and to ensure her safety.

79.    On or about May 31, 2012, WESLEY HOUSE and FKCS had knowledge that VICTIM was using a cell phone to plan to run away and that she said she was going to run away from FKCS JELSEMA, yet they allowed VICTIM to remain at the unsecure emergency shelter where she could not be protected from harm and exploitation even though her behavior had deteriorated further and she was dangerous to herself and met Baker Act criteria pursuant to Chapter 394, Florida Statutes.

80.     On or about June 1, 2012, OUR KIDS, WESLEY HOUSE, and FKCS had knowledge that VICTIM ran away from FKCS JELSEMA, this was her ninth runaway episode in the two months she was in foster care.

81.     Upon information and belief, VICTIM used a cell phone given to her by a FKCS staff member, the staff member encouraged VICTIM to run away from FKCS JELSEMA because she was going to be placed in a SIPP placement, and the staff member sold VICTIM into a human trafficking prostitution ring.

82.     On or about June 26, 2012, VICTIM was adjudicated dependent as to her mother based on a finding that she was not willing to assume custody of VICTIM and was unable to assure appropriate mental health services for VICTIM.

83.     On or about July 11, 2012, VICTIM was recovered from the human trafficking ring.

84.     During the forty-one (41) days VICTIM was a prisoner of the human trafficking ring, she was:

   a.   falsely imprisoned and repeatedly threatened with death and coerced by her captor(s) who placed the barrel of a gun next to her head if she tried to escape or did not engage in prostitution for her captors;

   b.   forced to take drugs to keep her from escaping;

   c.   constantly monitored and watched, including having someone in the bathroom with her resulting in physical injury for holding in stool;

   d.   repeatedly threatened that she would be murdered or her family would be murdered if she did not prostitute herself, did not engage in sex with her captors, tried to escape or was noncompliant with her captors in any way;

   e.   forced to engage in prostitution and sex with her captors; and

     f.   contracted sexually transmitted disease.

85.    Upon being recovered from the human trafficking ring, VICTIM was hospitalized and Baker Acted due to suicidal ideations.

86.    Between March 30, 2012 and June 1, 2012, OUR KIDS, WESLEY HOUSE, and FKCS failed to take any action to ensure VICTIM's safety, security and psychological, emotional and physical well-being while she was placed at the FKCS JELSEMA emergency shelter despite her deteriorating and harmful mental health condition.

87.    Between March 30, 2012 and June 1, 2012, OUR KIDS, WESLEY HOUSE, and FKCS failed to ensure VICTIM received individual counseling, psychiatric treatment, substance abuse treatment, targeted case management, and safe secure residential placement.

88.    OUR KIDS, WESLEY HOUSE, and FKCS had knowledge of VICTIM's serious medical and mental health needs, and failed to provide VICTIM with the services she required causing her mental health to significantly deteriorate and causing her to suffer further and permanent emotional, psychological and physical harm.

### COUNT I – NEGLIGENCE CLAIM AGAINST OUR KIDS OF MIAMI-DADE/MONROE, INC.

89.    Plaintiff hereby realleges paragraphs 1 - 88 as if fully set forth herein.

90.    At all times material hereto, OUR KIDS, as the lead community-based agency contracted to provide child welfare services in Miami-Dade and Monroe Counties, had the following duties:

    a.   To use reasonable care to keep VICTIM safe while in the custody of the State of Florida;

    b.   To provide a safe, secure environment where VICTIM was free from unreasonable risk of harm;

    c.   To use reasonable care in the oversight and supervision of VICTIM;

d.  To establish and maintain an adequate system for case management ensuring appropriate oversight of subcontracted agencies;

e.  To continually monitor the performance of subcontracted agencies, including WESLEY HOUSE, to ensure they were meeting children's needs for services and safety;

f.  To have available an appropriate continuum of services to address VICTIM's mental health and substance abuse needs;

g.  To have available an appropriate continuum of placements to address VICTIM's mental health and substance abuse needs;

h.  To protect VICTIM from further abuse, neglect, and victimization;

i.  To investigate the fitness of any proposed placement for VICTIM, taking into account her individualized physical, emotional, behavioral, and social needs, as well as her background and history;

j.  To ensure its subcontracted case management agencies investigated all relevant conditions of emergency shelters that might affect VICTIM;

k.  To continually assess the adequacy and safety of VICTIM's particular placement;

l.  To ensure all necessary and appropriate evaluations and assessments  for VICTIM were completed in a timely manner, including but not limited to, Level of Care Assessments, Suitability Assessments, mental health assessments, psychiatric assessments, and substance abuse assessments;

m.  To ensure that all recommendations from assessors, evaluators, and other professionals regarding VICTIM, were followed and implemented in a timely manner;

n.  To ensure that VICTIM received appropriate services to meet her needs, including, but not limited to, individual counseling, substance abuse treatment, education services, targeted case management, psychiatric treatment, and secure residential placement;

o.  To ensure that VICTIM was Baker Act when her behavior was a threat to herself, a threat to others, and she met the criteria pursuant to Chapter 394, Florida Statutes;

p.  To comply with Florida Statutes, Florida Administrative Code, Department Operating Procedures, OUR KIDS Operating Procedures, and Court Orders

21

regarding the safety of VICTIM and her need for mental health and substance abuse services;

q.  To ensure that safety plans or plans of care were implemented to ensure VICTIM was safe and appropriately cared for;

r.  To provide any necessary safety measures to ensure VICTIM was adequately supervised;

s.  To provide any necessary safety measures to ensure VICTIM was in a safe placement;

t.  To outline a plan of care to handle any special management issues identified in the history and assessments to ensure that all children in emergency shelter care, including VICTIM, were safe, appropriately cared for, and adequately supervised;

u.  To properly report, investigate and take action on incidents of children in the custody and care of the State of Florida, including VICTIM, eloping and running away from its physical custody and/or their placements;

v.  To implement reasonable safeguards to prevent children in the custody of the State of Florida, including VICTIM, from eloping and running away, to immediately report all children known to be missing, including VICTIM, to law enforcement, the Court, and the Department, among others, and to take all reasonable and necessary steps and action to take such children back into physical custody and place them in a safe, secure placement;

w.  To ensure that VICTIM was assessed, referred for appropriate services, and placed in a safe placement each and every time she was recovered from runaway status;

x.  To ensure VICTIM, was provided with appropriate services, including, but not necessarily limited to, independent living services for older children, and fully prepared to successfully and safely exit from state custody and care, either through reunification, adoption, or aging out; and

y.  To ensure that VICTIM was provided with appropriate education, including, but not limited to, a school education program and an individual education plan, so she could graduate from high school or obtain her GED.

91.   OUR KIDS, through its agents and/or employees, breached said non-discretionary and non-delegable duties.

92.     As a direct and proximate result of the aforementioned breach, VICTIM suffered deteriorating mental health and was further subjected to repeated instances of sexual abuse, human trafficking, and suffered and will continue to suffer, severe bodily harm and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, and expenses of hospitalization, medical and nursing care and treatment, and exacerbation of preexisting conditions.  The losses are either permanent or continuing in nature and VICTIM will suffer such losses in the future.

WHEREFORE, Plaintiff, VICTIM, demands judgment against Defendant, OUR KIDS OF MIAMI-DADE/MONROE, INC., for compensatory damages, costs, and all other such relief as the Court may deem just and proper.

## COUNT II – CULPABLE NEGLIGENCE CLAIM AGAINST OUR KIDS OF MIAMI-DADE/MONROE, INC.

93.     Plaintiff hereby realleges paragraphs 1 - 88 as if fully set forth herein.

94.     The cumulative actions on the part of Defendant OUR KIDS exhibited willful and wanton disregard of human rights, safety, and/or property in its provision of protective supervision to VICTIM and/or exhibited reckless indifference or grossly careless disregard of human life in its provision of protective supervision to VICTIM based upon the following facts:

       a.  OUR KIDS had knowledge that it operated a child welfare system of care in Miami-Dade and Monroe Counties with insufficient placements to appropriately meet foster children's needs, including VICTIM;

       b.  OUR KIDS had knowledge that it operated a child welfare system of care in Miami-Dade and Monroe Counties with insufficient mental health and substance abuse services to meet foster children's needs, including VICTIM;

c.   OUR KIDS had knowledge that it operated a child welfare system of care with four times the rate of missing children as the region with the lowest rate;

d.   OUR KIDS had knowledge that it operated a child welfare system of care in Miami-Dade and Monroe Counties that could never protect children it was responsible for from harm, including VICTIM, because it subcontracted out all case management responsibilities and failed to remain directly involved in cases;

e.   OUR KIDS failed to ensure VICTIM was immediately placed in a residential substance abuse program as recommended by the JARF facility when she was placed in foster care;

f.   OUR KIDS failed to ensure VICTIM immediately received individual counseling, substance abuse treatment, psychiatric treatment, and targeted case management when she was placed in foster care despite knowledge that these services had been recommended and were necessary to ensure her safety;

g.   OUR KIDS failed to ensure VICTIM immediately received a Level of Care Assessment due to her known serious medical and mental health needs;

h.   OUR KIDS failed to ensure VICTIM immediately received a Suitability Assessment to recommend placement in residential placement due to her known serious medical and mental health needs;

i.   OUR KIDS failed to ensure the recommendations from VICTIM's Level of Care Assessment and Suitability Assessment were immediately complied with despite knowledge that both evaluators warned of VICTIM's risk for harm and exploitation;

24

j.  OUR KIDS failed to ensure VICTIM was immediately placed in a secure residential treatment center after it was ordered to obtain such placement INSTANTER by the dependency judge; and

k.  OUR KIDS had knowledge that FKCS JELSEMA was a dangerous placement for VICTIM, that it could not meet her mental health needs, and that she ran from the facility eight times, but repeatedly authorized her placement back in this facility despite the known dangers and failed to ensure she received the appropriate services and secure placement she needed.

95.  The caps and limitations of §§ 409.1671 and 409.993, Florida Statutes, are inapplicable to VICTIM's damages, which are described in paragraph 92 because of OUR KIDS reckless, willful and dangerous behaviors and because OUR KIDS did not meet other statutory requirements and conditions regarding appropriate coverage as to avail itself of said caps.

WHEREFORE, Plaintiff demands judgment for damages in excess of the statutory caps found in §§ 409.1671 and 409.993, Florida Statutes, against Defendant, OUR KIDS OF MIAMI-DADE/MONROE, INC.

## COUNT III – 42 U.S.C. § 1983 CLAIM AGAINST
## OUR KIDS OF MIAMI-DADE/MONROE, INC.

96.  Plaintiff reavers and realleges paragraphs 1 through 88 above as if fully set forth herein.

97.  This action arises under and is brought pursuant to 42 U.S.C. §1983 to remedy the deprivation, under color of state law, of Plaintiff's guaranteed rights under the Fourteenth Amendment of the United States Constitution.

98.  At all times material hereto, OUR KIDS was a "person" and was acting under the color of state law within the meaning of 42 U.S.C. § 1983.

99.     At all times material hereto, pursuant to §§ 409.1671(1)(f)(1) and 409.993(1)(a), Florida Statutes, foster care is a public function traditionally within the exclusive prerogative of the State of Florida.

100.     At all times material hereto, it was clearly established that children in the physical custody of the state foster care system, including VICTIM, had the constitutionally protected right to be safe and free from unreasonable risk of harm.

101.     OUR KIDS established and enforced a custom, policy, or practice that failed to require appropriate placements for foster children in accordance with professional judgment.

102.     OUR KIDS established and enforced a custom, policy, or practice that failed to ensure that mental health needs of foster children in state custody were assessed, evaluated, and treated in accordance with professional judgment.

103.     OUR KIDS established and enforced a custom, policy, or practice on a widespread basis that failed to require recommendations from psychological evaluations, psychiatric evaluations, substance abuse evaluations, mental health evaluations, Level of Care Assessments, and Suitability Assessments, to be followed in accordance with professional judgment, thereby exposing children in its care to the substantial risk of serious harm.

104.     OUR KIDS established and enforced a custom, policy, or practice that failed to require foster children's mental health needs to be met.

105.     OUR KIDS established and enforced a custom, policy, or practice which did not have adequate foster care placements to meet the placements needs of foster children in Miami-Dade and Monroe Counties.

106.     OUR KIDS established and enforced a custom, policy, or practice of allowing foster children with known mental, behavioral, emotional, and substance abuse problems to be

26

placed in dangerous emergency shelter placements notwithstanding that it was exposing such children to the substantial risk of serious harm.

107.   OUR KIDS established and enforced a custom, policy, or practice of failing to appropriately monitor its subcontracted providers and of deliberately failing to learn of dangers that children in its custody were exposed to.

108.   OUR KIDS was responsible, but failed to ensure that children under its care, including VICTIM, had a complete and accurate plan of care that addressed their needs consistent with their mental health evaluations and their level of care and failed to continually assess and determine any need for service referrals in accordance with professional judgment.

109.   OUR KIDS maintained ultimate responsibility to ensure that children in its care received adequate care and protection from harm and was required to, but failed, to implement policies and procedures to verify the accuracy or ensure the completeness of information provided by case management agencies concerning the welfare of foster children, including VICTIM.

110.   At all times material hereto, OUR KIDS did not provide services or placements to VICTIM, who was in the physical and legal custody of OUR KIDS and the Department, in accordance with professional judgment, and was deliberately indifferent and/or acted with reckless disregard to the Plaintiff's health, safety, and welfare and Constitutional and federal rights, including, without limitation, by failing to ensure VICTIM received a timely Level of Care Assessment as necessary, failing to ensure VICTIM received a timely Suitability Assessment as necessary and recommended, failing to ensure that VICTIM received individual counseling as necessary and recommended, failing to ensure that VICTIM received substance abuse treatment as necessary and recommended, failing to ensure that VICTIM was placed in a safe environment that could meet her needs, failing to ensure VICTIM was placed in a secure residential treatment

facility when recommended and court ordered, failing to have appropriate and available placements for foster children in Miami-Dade and Monroe Counties, failing to monitor its subcontractors to ensure child safety, and by directly exposing VICTIM to sexual abuse and human trafficking and causing her mental health condition to deteriorate.

111.   OUR KIDS established and maintained an unconstitutional system of care that resulted in the widespread harm to foster children, including VICTIM, because it abdicated its constitutional and statutory duties to ensure that each child in its care was free from harm by delegating all responsibility to its subcontractors with no direct supervision or any other case involvement that would be necessary to meeting its constitutional and statutory duties, resulting in a child welfare system that permitted case managers to operate unchecked, unsupervised, and blatantly ignore and/or deliberately fail to learn of the plethora of red flags, dangers and warning signs that VICTIM's needs were not being properly assessed and provided for.  In this regard, OUR KIDS violated Plaintiff's Constitutional rights in that:

> a.   OUR KIDS accepted responsibility for the care of VICTIM knowing that VICTIM was in immediate need of therapeutic services, but failed to refer her for immediate therapeutic services.
>
> b.   OUR KIDS accepted responsibility for the care of VICTIM knowing that VICTIM was in immediate need of residential substance abuse services, but failed to refer her for immediate substance abuse services.
>
> c.   OUR KIDS accepted responsibility for the care of VICTIM knowing that VICTIM was in immediate need of secure residential psychiatric services, but failed to refer her for immediate secure residential psychiatric services and

instead repeatedly authorized placement at the FKCS JELSEMA emergency shelter, a dangerous placement that could not protect VICTIM from harm.

d.  OUR KIDS accepted responsibility for the custody and care of VICTIM knowing that VICTIM was at high risk for danger, elopement and running away, had run away multiple times previously, and that she intended to run away from FKCS JELSEMA if she was placed there, yet OUR KIDS repeatedly authorized placement of VICTIM at the FKCS JELSEMA emergency shelter, a dangerous placement that could not and did not prevent VICTIM from running away and could not and did not protect VICTIM from harm.

e.  OUR KIDS accepted responsibility for the care of VICTIM without otherwise ever independently assessing her needs and confirming that her needs were being met, before or after assigning the case to its subcontracted case management agency.

f.  OUR KIDS then assigned VICTIM's case to a case management agency knowing that VICTIM was in immediate need of therapeutic, behavioral, mental health, psychiatric, psychological, emotional, substance abuse, and residential services but failing to ensure that she was assessed and referred for these immediate services.

112.   OUR KIDS violated its duties to oversee case management agencies by making deliberate choices from among various alternatives that created known risks that foster children under its care would not receive adequate care and protection from harm, and these policies were a substantial factor in the violation of VICTIM'S rights, by establishing and maintaining a system of care involving use of subcontracting to other agencies, multiple dangerous placements, lack of

monitoring and confirming that the needs of each child were met, including VICTIM, and thus engaging in a deliberate failure to learn of the children's conditions and deliberate failure to determine and verify that their needs were being met and their constitutionally-protected rights upheld by the subcontracted agencies.

113.   OUR KIDS was deliberately indifferent to the serious psychiatric and psychological needs of children in its care and custody.

114.   At all times that OUR KIDS was taking the actions described herein, it was clearly established that children in the physical custody of the state foster care system, like VICTIM, have the Constitutionally and federally protected right to receive mental health services in accordance with professional judgment and not be exposes to deterioration of mental health and emotional harm.

115.   Despite possessing the authority and means to remedy the unconstitutional treatment of the child and seek safe and secure therapeutic residential placement and services to address VICTIM's serious mental health needs, OUR KIDS was deliberately indifferent to VICTIM's right to receive treatment for her serious mental health needs by failing to timely assess her emotional, behavioral, mental health, and substance abuse needs, failing to timely address VICTIM's emotional, behavioral, mental health, and substance abuse needs, and failing to ensure VICTIM received safe, stable, therapeutic residential placement, which subjected VICTIM to further psychological harm and deterioration.

116.   Despite possessing the authority and means to remedy the unconstitutional treatment of VICTIM, OUR KIDS was deliberately indifferent to VICTIM's medical, mental health, behavioral, psychological, emotional, and substance abuse need and the substantial risk

that VICTIM's condition would continue to deteriorate and OUR KIDS knowingly and recklessly disregarded an excessive risk to her health and safety.

117.    At all times material hereto, OUR KIDS had knowledge of the dangers and risks of harm to foster children and children in state care, and to the VICTIM in particular, when on runaway status and/or away from their placement without authorization, including, but not necessarily limited to, physical and sexual assault, rape, pregnancy, sexually transmitted diseases, drug and alcohol use, homelessness, prostitution, abduction and kidnaping, domestic violence, human trafficking, murder and death (said dangers having been extensively studied, reported upon, and are well known to child welfare professionals throughout the State of Florida and nationwide). Despite this knowledge, in violation of multiple Florida Statutes, Florida Administrative Code Rules, OUR KIDS' Operating Procedures, and Court Orders, OUR KIDS failed to ensure VICTIM was placed in a safe placement or a secure facility, failed to prevent VICTIM from eloping and running away, failed to ensure VICTIM was placed in a safe placement or a secure facility when she returned from runaway, and failed to properly handle a runaway child or a child in danger and at risk of eloping by failing to staff the case to discuss service needs.

118.    At all times material hereto, OUR KIDS had knowledge that VICTIM was likely to elope and run away, and deliberately and/or recklessly failed to take any action to prevent said elopement and runway episodes and her subsequent injuries.

119.    OUR KIDS took said actions described herein knowing it was exposing children who were in State custody, including VICTIM, to a substantial risk of serious harm.

120.    OUR KIDS violated VICTIM's fundamental right of physical safety subjecting her to a heightened risk of danger.

121.    OUR KIDS' actions and failures to act were done with knowledge that said actions would deprive VICTIM of her constitutional rights to be free from harm.

122.    As a direct and proximate result of OUR KIDS' deliberate indifference and/or recklessness, VICTIM suffered serious physical harm and trauma, psychological trauma, pain and suffering, sexual abuse victimization, deterioration, discomfort, loss of capacity for the enjoyment of life, and other reasonably foreseeable compensatory damages.

123.    VICTIM is obligated to the undersigned firms for payment of attorney's fees and costs, and seek recovery of reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. § 1988.

WHEREFORE, Plaintiff VICTIM prays that this Honorable Court enter a judgment in favor of Plaintiff against Defendant OUR KIDS OF MIAMI-DADE/MONROE, INC., for all recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem appropriate and proper.

## COUNT IV – NEGLIGENCE CLAIM AGAINST
## WESLEY HOUSE FAMILY SERVICES, INC.

124.    Plaintiff hereby realleges paragraphs 1 - 88 as if fully set forth herein.

125.    At all times material hereto, WESLEY HOUSE, as the case management agency contracted to provide child welfare services in Monroe County, had the following duties:

   a.  To use reasonable care to keep VICTIM safe while in the custody of the State of Florida;

   b.  To provide a safe, secure environment where VICTIM was free from unreasonable risk of harm;

   c.  To use reasonable care in the oversight and supervision of VICTIM;

   d.  To have available an appropriate continuum of services to address VICTIM's mental health and substance abuse needs;

e.  To have available an appropriate continuum of placements to address VICTIM's mental health and substance abuse needs;

f.  To protect VICTIM from further abuse, neglect, and victimization;

g.  To investigate the fitness of any proposed placement for VICTIM, taking into account her individualized physical, emotional, behavioral, and social needs, as well as her background and history;

h.  To continually assess the adequacy and safety of VICTIM's particular placement;

i.  To ensure all necessary and appropriate evaluations and assessments  for VICTIM were completed in a timely manner, including but not limited to, Level of Care Assessments, Suitability Assessments, mental health assessments, psychiatric assessments, and substance abuse assessments;

j.  To ensure that all recommendations from assessors, evaluators, and other professionals regarding VICTIM, were followed and implemented in a timely manner;

k.  To ensure that VICTIM received appropriate services to meet her needs, including, but not limited to, individual counseling, substance abuse treatment, education services, targeted case management, psychiatric treatment, and secure residential placement;

l.  To ensure that VICTIM was Baker Acted when her behavior was a threat to herself, a threat to others, and she met the criteria pursuant to Chapter 394, Florida Statutes;

m. To comply with Florida Statutes, Florida Administrative Code, Department Operating Procedures, OUR KIDS Operating Procedures, WESLEY HOUSE Operating Procedures, and Court Orders regarding the safety of VICTIM and her need for mental health and substance abuse services ;

n.  To ensure that safety plans or plans of care were implemented to ensure VICTIM was safe and appropriately cared for;

o.  To provide any necessary safety measures to ensure VICTIM was adequately supervised;

p.  To provide any necessary safety measures to ensure VICTIM was in a safe placement;

q.  To outline a plan of care to handle any special management issues identified in the history and assessments to ensure that all children in emergency shelter care,

including VICTIM, were safe, appropriately cared for, and adequately supervised;

r.  To properly report, investigate and take action on incidents of children in the custody and care of the State of Florida, including VICTIM, eloping and running away from its physical custody and/or their placements;

s.  To implement reasonable safeguards to prevent children in the custody of the State of Florida, including VICTIM, from eloping and running away, to immediately report all children known to be missing, including VICTIM, to law enforcement, the Court, and the Department, among others, and to take all reasonable and necessary steps and action to take such children back into physical custody and place them in a safe, secure placement;

t.  To ensure that VICTIM was assessed, referred for appropriate services, and placed in a safe placement each and every time she was recovered from runaway status;

u.  To ensure VICTIM, was provided with appropriate services, including, but not necessarily limited to, independent living services for older children, and that she was fully prepared to successfully and safely exit from state custody and care, either through reunification, adoption, or aging out;

v.  To ensure that VICTIM was provided with appropriate education, including, but not limited to, a school education program and an individual education plan, so she could graduate from high school or obtain her GED and

w.  To monitor its subcontracted agencies, including FKCS, for child safety and compliance with Florida Statutes, Florida Administrative Code, Department Operating Procedures, OUR KIDS' Operating Procedures, WESLEY HOUSE Operating Procedures, and FKCS Policies and Procedures.

126.  WESLEY HOUSE, through its agents and/or employees, breached said duties.

127.  As a direct and proximate result of the aforementioned breach, VICTIM suffered deteriorating mental health and was further subjected to repeated instances of sexual abuse and human trafficking, and suffered and will continue to suffer, severe bodily harm and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, and expenses of hospitalization, medical and nursing care and treatment, and exacerbation of preexisting

34

conditions.  The losses are either permanent or continuing in nature and VICTIM will suffer such losses in the future.

WHEREFORE, Plaintiff, VICTIM, demands judgment against Defendant, WESLEY HOUSE FAMILY SERVICES, INC., for compensatory damages, costs, and all other such relief as the Court may deem just and proper.

### COUNT V – CULPABLE NEGLIGENCE CLAIM AGAINST WESLEY HOUSE FAMILY SERVICES, INC.

128.    Plaintiff hereby realleges paragraphs 1 - 88 as if fully set forth herein.

129.    The cumulative actions on the part of Defendant WESLEY HOUSE exhibited willful and wanton disregard of human rights, safety, and/or property in its provision of protective supervision to VICTIM and/or exhibited reckless indifference or grossly careless disregard of human life in its provision of protective supervision to VICTIM based upon the following facts:

a.   WESLEY HOUSE had knowledge that it operated a child welfare system of care in Monroe County with insufficient placements to appropriately meet foster children's needs, including VICTIM;

b.   WESLEY HOUSE had knowledge that it operated a child welfare system of care in Monroe County with insufficient mental health and substance abuse services to meet foster children's needs, including VICTIM;

c.   WESLEY HOUSE failed to ensure VICTIM was immediately placed in a residential substance abuse program as recommended by the JARF facility when she was placed in foster care;

d.   WESLEY HOUSE failed to ensure VICTIM immediately received individual counseling, substance abuse treatment, psychiatric treatment, and targeted case management when she was placed in foster care despite knowledge that these

services had been recommended and were necessary to meet her needs and ensure her safety;

e.   WESLEY HOUSE failed to ensure VICTIM immediately received a Level of Care Assessment due to her known serious medical and mental health needs;

f.   WESLEY HOUSE failed to ensure VICTIM immediately received a Suitability Assessment to recommend placement in residential placement due to her known serious medical and mental health needs;

g.   WESLEY HOUSE failed to ensure the recommendations from VICTIM's Level of Care Assessment and Suitability Assessment were immediately complied with despite knowledge that both evaluators warned of VICTIM's risk for harm and exploitation;

h.   WESLEY HOUSE failed to ensure VICTIM was immediately placed in a secure residential treatment center upon order of the dependency judge; and

i.   WESLEY HOUSE had knowledge that FKCS JELSEMA was a dangerous placement for VICTIM, that it could not meet her needs, and that she ran from the facility eight times, but repeatedly placed her back in this facility despite the known dangers and failed to ensure she received the appropriate services and secure placement she needed.

130.   The caps and limitations of §§ 409.1671 and 409.993, Florida Statutes, are inapplicable to VICTIM's damages, which are described in paragraph 127 because of WESLEY HOUSE'S reckless, willful and dangerous behaviors and because WESLEY HOUSE did not meet other statutory requirements and conditions regarding appropriate coverage as to avail itself of said caps.

WHEREFORE, Plaintiff demands judgment for damages in excess of the statutory caps found in §§ 409.1671 and 409.993, Florida Statutes, against Defendant, WESLEY HOUSE FAMILY SERVICES, INC.

**COUNT VI – 42 U.S.C. § 1983 CLAIM AGAINST
WESLEY HOUSE FAMILY SERVICES, INC.**

131.    Plaintiff reavers and realleges paragraphs 1 through 88 above as if fully set forth herein.

132.    This action arises under and is brought pursuant to 42 U.S.C. §1983 to remedy the deprivation, under color of state law, of Plaintiff's guaranteed rights under the Fourteenth Amendment of the United States Constitution.

133.    At all times material hereto, WESLEY HOUSE was a "person" and was acting under the color of state law within the meaning of 42 U.S.C. § 1983.

134.    At all times material hereto, pursuant to §§ 409.1671(1)(f)(1) and 409.993(1)(a), Florida Statutes, foster care is a public function traditionally within the exclusive prerogative of the State of Florida.

135.    At all times material hereto, it was clearly established that children in the physical custody of the state foster care system, including VICTIM, had the constitutionally protected right to be safe and free from unreasonable risk of harm.

136.    WESLEY HOUSE established and enforced a custom, policy, or practice that failed to require appropriate placements for foster children in accordance with professional judgment.

137.    WESLEY HOUSE established and enforced a custom, policy, or practice that failed to ensure that mental health needs of foster children in state custody were assessed, evaluated, and treated in accordance with professional judgment.

138.    WESLEY HOUSE established and enforced a custom, policy, or practice on a widespread basis that failed to require recommendations from psychological evaluations, psychiatric evaluations, substance abuse evaluations, mental health evaluations, Level of Care Assessments, and Suitability Assessments, to be followed in accordance with professional judgment, thereby exposing children in its care to the substantial risk of serious harm.

139.    WESLEY HOUSE established and enforced a custom, policy, or practice that failed to require foster children's mental health needs to be met.

140.    WESLEY HOUSE established and enforced a custom, policy, or practice which did not have adequate foster care placements to meet the placements needs of foster children in Monroe County.

141.    WESLEY HOUSE established and enforced a custom, policy, or practice of allowing foster children with known mental, behavioral, emotional, and substance abuse problems to be placed in dangerous emergency shelter placements notwithstanding that it was exposing such children to the substantial risk of serious harm.

142.    WESLEY HOUSE was responsible, but failed to ensure that children under its care, including VICTIM, had a complete and accurate plan of care that addressed their needs consistent with mental health evaluations and their level of care and failed to continually assess and determine any need for service referrals in accordance with professional judgment.

143.    At all times material hereto, WESLEY HOUSE did not provide services or placements in accordance with professional judgment, was deliberately indifferent and/or acted with reckless disregard to the Plaintiff's health, safety, and welfare and Constitutional and federal rights, including, without limitation, by failing to ensure VICTIM received a timely Level of Care Assessment  as necessary, failing to ensure VICTIM received a timely Suitability Assessment as

necessary and recommended, failing to ensure that VICTIM received individual counseling as necessary and recommended, failing to ensure that VICTIM received substance abuse treatment as necessary and recommended, failing to ensure that VICTIM was placed in a safe environment that could meet her needs, failing to ensure VICTIM was placed in a secure residential treatment facility when recommended and court ordered, failing to have appropriate and available placements for foster children in Monroe County, by failing to attend a critical staffing for VICTIM's placement in secure residential treatment and by directly exposing VICTIM to sexual abuse and human trafficking and causing her mental health condition to deteriorate.

144.    WESLEY HOUSE blatantly ignored and/or deliberately failed to learn of the plethora of red flags, dangers and warning signs that VICTIM's needs were not being properly assessed and provided for.  In this regard, WESLEY HOUSE violated Plaintiff's Constitutional rights in that:

a.   WESLEY HOUSE accepted responsibility for the care of VICTIM knowing that VICTIM was in immediate need of therapeutic services, but failed to refer her for immediate therapeutic services.

b.   WESLEY HOUSE accepted responsibility for the care of VICTIM knowing that VICTIM was in immediate need of residential substance abuse services, but failed to refer her for immediate substance abuse services.

c.   WESLEY HOUSE accepted responsibility for the care of VICTIM knowing that VICTIM was in immediate need of secure residential psychiatric services, but failed to refer her for immediate secure residential psychiatric services and instead repeatedly placed her at the FKCS JELSEMA emergency shelter, a dangerous placement that could not protect VICTIM from harm.

39

d. WESLEY HOUSE accepted responsibility for the care of VICTIM in the physical and legal custody of the Department and Our Kids knowing that VICTIM was at high risk for elopement and running away, had run away multiple times previously, and that she intended to run away from FKCS JELSEMA if she was placed there, yet WESLEY HOUSE repeatedly placed VICTIM at the FKCS JELSEMA emergency shelter, a dangerous placement that could not and did not prevent VICTIM from running away and could not and did not protect VICTIM from harm.

e. WESLEY HOUSE was deliberately indifferent to VICTIM's serious psychiatric and mental health needs.

145.    At all times that WESLEY HOUSE was taking the actions described herein, it was clearly established that children in the physical custody of the state foster care system, like VICTIM, have the Constitutionally and federally protected right to receive the necessary, most appropriate and best available services to address all of their medical, mental health, emotional, and behavioral needs.

146.    Despite possessing the authority and means to remedy the unconstitutional treatment of the child and seek safe and secure therapeutic residential placement and services to address VICTIM's serious mental health needs, WESLEY HOUSE was deliberately indifferent to VICTIM's right to receive treatment for her serious mental health needs by failing to timely assess her emotional, behavioral, mental health, and substance abuse needs, failing to timely address VICTIM's emotional, behavioral, mental health, and substance abuse needs, and failing to ensure VICTIM received safe, stable, therapeutic residential placement, which subjected VICTIM to further psychological harm and deterioration.

147.    Despite possessing the authority and means to remedy the unconstitutional treatment of VICTIM, WESLEY HOUSE was deliberately indifferent to VICTIM's medical, mental health, behavioral, psychological, emotional, and substance abuse need and the substantial risk that VICTIM's condition would continue to deteriorate and WESLEY HOUSE knowingly and recklessly disregarded an excessive risk to her health and safety.

148.    At all times material hereto, WESLEY HOUSE had knowledge of the dangers and risks of harm to foster children and children in state care, and to the VICTIM in particular, when on runaway status and/or away from their placement without authorization, including, but not necessarily limited to, physical and sexual assault, rape, pregnancy, sexually transmitted diseases, drug and alcohol use, homelessness, prostitution, abduction and kidnaping, domestic violence, human trafficking, murder and death (said dangers having been extensively studied, reported upon, and are well known to child welfare professionals throughout the State of Florida and nationwide). Despite this knowledge, in violation of multiple Florida Statutes, Florida Administrative Code Rules, Defendants' Operating Procedures, and Court Orders, WESLEY HOUSE failed to ensure VICTIM was placed in a safe placement or a secure facility, failed to prevent VICTIM from eloping and running away, failed to ensure VICTIM was placed in a safe placement or a secure facility when she returned from runaway, failed to properly handle a runaway child or a child in danger and at risk of eloping by failing to staff the case to discuss service needs.

149.    At all times material hereto, WESLEY HOUSE had knowledge that VICTIM was likely to elope and run away, and deliberately and/or recklessly failed to take any action to prevent said elopement and runway episodes, provide assessment and services based upon professional judgment upon her return and was a substantial factor in causing her subsequent injuries.

150.    WESLEY HOUSE took said actions described herein knowing it was exposing children who were in State custody, including VICTIM, to a substantial risk of serious harm.

151.    WESLEY HOUSE violated VICTIM's fundamental right of physical safety subjecting her to a heightened risk of danger.

152.    WESLEY HOUSE'S actions and failures to act were done with knowledge that said actions would deprive VICTIM of her constitutional rights to be free from harm.

153.    As a direct and proximate result of WESLEY HOUSE'S deliberate indifference and/or recklessness, VICTIM suffered serious physical harm and trauma, psychological trauma, pain and suffering, sexual abuse victimization, deterioration, discomfort, loss of capacity for the enjoyment of life, and other reasonably foreseeable compensatory damages.

154.    VICTIM is obligated to the undersigned firms for payment of attorney's fees and costs, and seek recovery of reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. § 1988.

WHEREFORE, Plaintiff VICTIM prays that this Honorable Court enter a judgment in favor of Plaintiff against Defendant WESLEY HOUSE FAMILY SERVICES, INC., for all recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem appropriate and proper.

## COUNT VII – NEGLIGENCE CLAIM AGAINST FLORIDA KEYS CHILDREN'S SHELTER, INC.

155.    Plaintiff hereby realleges paragraphs 1 - 88 as if fully set forth herein.

156.    At all times material hereto, FKCS, as the subcontracted community-based agency providing emergency shelter services to foster children in Monroe County, had the following duties:

a.  To use reasonable care to keep VICTIM safe while in the custody of the State of Florida;

b.  To provide a safe, secure environment where VICTIM was free from unreasonable risk of harm;

c.  To use reasonable care in the oversight and supervision of VICTIM;

d.  To deny VICTIM admission into FKCS JELSEMA based on her special needs and severe emotional problems that FKCS could not accommodate;

e.  To have knowledge of VICTIM's individualized physical, emotional, behavioral, and social needs, as well as her background and history upon admission into FKCS JELSEMA, and if such information wasn't immediately available, to follow-up with WESLEY HOUSE and OUR KIDS until such information was received;

f.  To ensure VICTIM received a comprehensive psychosocial assessment, mental health screening, suicide risk screening, assessment of suicide risk, and a substance abuse screening upon admission to FKCS JELSEMA and ongoing as needed through her placement(s) at FKCS JELSEMA;

g.  To provide VICTIM with direct services to meet her mental health needs, including, but not limited to, intensive crisis counseling, case management, individual counseling, group counseling, family counseling, substance abuse treatment, runaway prevention services, and educational services timely upon identification of the need;

h.  To refer VICTIM for substance abuse and psychiatric services timely upon identification of the need;

i.  To ensure that all recommendations from assessors, evaluators, and other professionals regarding VICTIM, were followed and implemented in a timely manner;

j.  To ensure that VICTIM received appropriate services to meet her needs, including, but not limited to, individual counseling, substance abuse treatment, education services, psychiatric treatment, and secure residential placement;

k.  To protect VICTIM from further abuse, neglect, and victimization;

l.  To continually assess the adequacy and safety of VICTIM's placement at FKCS JELSEMA;

m.  To ensure that VICTIM was Baker Acted when her behavior was a threat to herself, a threat to others, and she met the criteria pursuant to Chapter 394, Florida Statutes;

n.  To ensure VICTIM was placed on sight and sound and/or one on one supervision when her behavior indicated that this was necessary for her safety;

o.  To comply with Florida Statutes, Florida Administrative Code, Department Operating Procedures, and FKCS Operating Procedures regarding the safety of VICTIM and her need for mental health and substance abuse services;

p.  To ensure that safety plans or plans of care were implemented to ensure VICTIM was safe and appropriately cared for;

q.  To provide any necessary safety measures to ensure VICTIM was adequately supervised;

r.  To properly report, investigate and take action on incidents of children in the custody and care of the State of Florida, including VICTIM, eloping and running away from its physical custody and/or their placements;

s.  To implement reasonable safeguards to prevent children in the custody of the State of Florida, including VICTIM, from eloping and running away, to immediately report all children known to be missing, including VICTIM, to law enforcement, the Court, and the Department, among others, and to take all reasonable and necessary steps and action to take such children back into physical custody and place them in a safe, secure placement;

t.  To ensure that VICTIM was assessed, referred for appropriate services, and placed in a safe placement each and every time she was recovered from runaway status; and

u.  To ensure that VICTIM was provided with appropriate education, including, but not limited to, a school education program and an individual education plan, so she could graduate from high school or obtain her GED.

157.  FKCS, through its agents and/or employees, breached said duties.

158.  As a direct and proximate result of the aforementioned breach, VICTIM suffered deteriorating mental health and was further subjected to repeated instances of sexual abuse and human trafficking, and suffered and will continue to suffer, severe bodily harm and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, and expenses

44

of hospitalization, medical and nursing care and treatment, and exacerbation of preexisting conditions.  The losses are either permanent or continuing in nature and VICTIM will suffer such losses in the future.

WHEREFORE, Plaintiff, VICTIM, demands judgment against Defendant, FLORIDA KEYS CHILDREN'S SHELTER, INC., for compensatory damages, costs, and all other such relief as the Court may deem just and proper.

## COUNT VIII – CULPABLE NEGLIGENCE CLAIM AGAINST FLORIDA KEYS CHILDREN'S SHELTER, INC.

159.    Plaintiff hereby realleges paragraphs 1 - 88 as if fully set forth herein.

160.    The cumulative actions on the part of Defendant FKCS exhibited willful and wanton disregard of human rights, safety, and/or property in its provision of protective supervision to VICTIM and/or exhibited reckless indifference or grossly careless disregard of human life in its provision of protective supervision to VICTIM based upon the following facts:

a.    FKCS had knowledge that it admitted foster children with serious emotional, behavioral, and substance abuse problems into FKCS JELSEMA that the emergency shelter was not equipped to handle, including VICTIM;

b.    FKCS failed to deny VICTIM admission into FKCS JELSEMA despite knowledge that it could not meet her needs or protect her from harm;

c.    FKCS failed to ensure VICTIM, who was in its physical and legal custody, received timely individual counseling, substance abuse treatment, and psychiatric treatment when she was placed at FKCS JELSEMA despite knowledge that these services had been recommended and were necessary to meet her needs based upon professional judgment to prevent her deterioration;

45

d.  FKCS failed to ensure the recommendations from VICTIM's Level of Care Assessment and Suitability Assessment were implemented despite knowledge that both evaluators warned of VICTIM's risk for harm and exploitation;

e.  FKCS had knowledge that FKCS JELSEMA was a dangerous placement for VICTIM, that it could not meet her needs, and that she ran from the facility eight times, but repeatedly admitted her back in this facility despite the known dangers and failed to ensure she received the appropriate services and secure placement she needed;

f.  FKCS had knowledge that foster children placed at FKCS JELSEMA had unsupervised access to cell phones and would use these cell phones to plan run away attempts, but failed to take any action to restrict the use of cell phones;

g.  FKCS had knowledge that VICTIM planned to run away, watched as she packed her belongings multiples times, watched as she either climbed out windows or walked out the back door, failed to stop her from running away, and instead actively encouraged her to run away;

h.  FKCS provided foster children, including VICTIM, with cell phones to facilitate running away and entry into human trafficking rings; and

i.  FKCS had a widespread policy of permitting child to run away exposing them to dangers on the streets

161.  The caps and limitations of §§ 409.1671 and 409.993, Florida Statutes, are inapplicable to VICTIM's damages, which are described in paragraph 158 because of FKCS' reckless, willful and dangerous behaviors and because FKCS did not meet other statutory requirements and conditions regarding appropriate coverage as to avail itself of said caps.

46

WHEREFORE, Plaintiff demands judgment for damages in excess of the statutory caps found in §§ 409.1671 and 409.993, Florida Statutes, against Defendant, FLORIDA KEYS CHILDREN'S SHELTER, INC.

**COUNT  IX – 42 U.S.C. § 1983 CLAIM AGAINST
FLORIDA KEYS CHILDREN'S SHELTER, INC.**

162.    Plaintiff reavers and realleges paragraphs 1 through 88 above as if fully set forth herein.

163.    This action arises under and is brought pursuant to 42 U.S.C. §1983 to remedy the deprivation, under color of state law, of Plaintiff's guaranteed rights under the Fourteenth Amendment of the United States Constitution.

164.    At all times material hereto, FKCS was a "person" and was acting under the color of state law within the meaning of 42 U.S.C. § 1983.

165.    At all times material hereto, pursuant to §§ 409.1671(1)(f)(1) and 409.993(1)(a), Florida Statutes, foster care is a public function traditionally within the exclusive prerogative of the State of Florida.

166.    At all times material hereto, it was clearly established that children in the physical custody of the state foster care system, including VICTIM, had the constitutionally protected right to be safe and free from unreasonable risk of harm.

167.    FKCS established and enforced a custom, policy, or practice that failed to ensure that mental health needs of foster children in state custody were assessed, evaluated, and treated in accordance with professional judgment.

168.    FKCS established and enforced a custom, policy, or practice that failed to require recommendations from psychological evaluations, psychiatric evaluations, substance abuse evaluations, mental health evaluations, Level of Care Assessments, and Suitability Assessments,

to be followed in accordance with professional judgment, and on a widespread basis exposing children in its care to the substantial risk of serious harm.

169.    FKCS established and enforced a custom, policy, or practice that failed to require foster children's mental health needs to be met.

170.    FKCS established and enforced a custom, policy, or practice of allowing foster children with known mental, behavioral, emotional, and substance abuse problems to be placed in dangerous emergency shelter placements notwithstanding that it was exposing such children to the substantial risk of serious harm.

171.    FKCS established and enforced a custom, policy, or practice of allowing foster children with known mental, behavioral, emotional, and substance abuse problems to freely walk out of FKCS JELSEMA and runaway, providing foster children with cell phones to coordinate running away, and encouraging foster children to run away, notwithstanding that it was exposing such children to the substantial risk of serious harm.

172.    At all times material hereto, FKCS did not provide services in accordance with professional judgment, was deliberately indifferent and/or acted with reckless disregard to the Plaintiff's health, safety, and welfare and Constitutional and federal rights, including, without limitation, by failing to ensure that VICTIM received individual counseling as necessary and recommended, failing to ensure that VICTIM received substance abuse treatment as necessary and recommended, failing to ensure that VICTIM was placed in a safe secure environment that could meet her needs, by being deliberately indifferent to VICTIM's serious needs, by delaying any psychiatric and mental health treatment and by directly exposing VICTIM to sexual abuse and human trafficking and causing her mental health condition to deteriorate.

173.    FKCS blatantly ignored and/or deliberately failed to learn of the plethora of red flags, dangers and warning signs that VICTIM's needs were not being properly assessed and provided for.  In this regard, FKCS violated Plaintiff's Constitutional rights in that:

    a.  FKCS accepted responsibility for the custody and care of VICTIM knowing that VICTIM was in immediate need of therapeutic services, but failed to provide her with immediate therapeutic services.

    b.  FKCS accepted responsibility for the care of VICTIM knowing that VICTIM was in immediate need of residential substance abuse services, and FKCS JELSEMA could not provide such services.

    c.  FKCS accepted responsibility for the care of VICTIM knowing that VICTIM was in immediate need of secure residential psychiatric services, and repeatedly admitted her to the FKCS JELSEMA emergency shelter, a dangerous placement that could not protect VICTIM from harm.

    d.  FKCS accepted responsibility for the care of VICTIM knowing that VICTIM was at high risk for elopement and running away, had run away multiple times previously, and that she intended to run away from FKCS JELSEMA if she was placed there, yet FKCS repeatedly admitted VICTIM to the FKCS JELSEMA emergency shelter, a dangerous placement that could not and did not prevent VICTIM from running away and could not and did not protect VICTIM from harm.

174.    At all times that FKCS was taking the actions described herein, it was clearly established that children in the physical custody of the state foster care system, like the Plaintiff VICTIM, have the Constitutionally and federally protected right to receive the necessary, most

appropriate and best available services to address all of their medical, mental health, emotional, and behavioral needs.

175.   Despite possessing the authority and means to remedy the unconstitutional treatment of the child and provide services to address VICTIM's serious mental health needs, FKCS was deliberately indifferent to VICTIM's right to receive treatment for her serious mental health needs by failing to timely assess her emotional, behavioral, mental health, and substance abuse needs, failing to address VICTIM's emotional, behavioral, mental health, and substance abuse needs, and failing to ensure VICTIM received safe, stable, therapeutic residential placement, which subjected VICTIM to further psychological harm and deterioration.

176.   Despite possessing the authority and means to remedy the unconstitutional treatment of VICTIM, FKCS was deliberately indifferent to VICTIM's medical, mental health, behavioral, psychological, emotional, and substance abuse need and the substantial risk that VICTIM's condition would continue to deteriorate and FKCS knowingly and recklessly disregarded an excessive risk to her health and safety.

177.   At all times material hereto, FKCS had knowledge of the dangers and risks of harm to foster children and children in state care, and to the VICTIM in particular, when on runaway status and/or away from their placement without authorization, including, but not necessarily limited to, physical and sexual assault, rape, pregnancy, sexually transmitted diseases, drug and alcohol use, homelessness, prostitution, abduction and kidnaping, domestic violence, human trafficking, murder and death (said dangers having been extensively studied, reported upon, and are well known to child welfare professionals throughout the State of Florida and nationwide). Despite this knowledge, in violation of multiple Florida Statutes, Florida Administrative Code Rules, Defendants' Operating Procedures, and Court Orders, FKCS failed to ensure VICTIM was

placed in a safe placement or a secure facility, failed to prevent VICTIM from eloping and running away, failed to ensure VICTIM was placed in a safe placement or a secure facility when she returned from runaway, failed to properly handle a runaway child or a child in danger and at risk of eloping by failing to staff the case to discuss service needs.

178.    At all times material hereto, FKCS had knowledge that VICTIM was likely to elope and run away, deliberately and/or recklessly failed to take any action to prevent said elopement and runway episodes and her subsequent injuries, and actively encouraged VICTIM to run away.

179.    FKCS took said actions described herein knowing it was exposing children who were in State custody, including VICTIM, to a substantial risk of serious harm.

180.    FKCS violated VICTIM's fundamental right of physical safety subjecting her to a heightened risk of danger.

181.    FKCS' actions and failures to act were done with knowledge that said actions would deprive VICTIM of her constitutional rights to be free from harm.

182.    As a direct and proximate result of FKCS' deliberate indifference and/or recklessness, VICTIM suffered serious physical harm and trauma, psychological trauma, pain and suffering, sexual abuse victimization, deterioration, discomfort, loss of capacity for the enjoyment of life, and other reasonably foreseeable compensatory damages.

183.    VICTIM is obligated to the undersigned firms for payment of attorney's fees and costs, and seek recovery of reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. § 1988.

WHEREFORE, Plaintiff VICTIM prays that this Honorable Court enter a judgment in favor of Plaintiff against Defendant FLORIDA KEYS CHILDREN'S SHELTER, INC., for all

recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the

Court may deem appropriate and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of all issues so triable in this case.

DATED this 30th day of March, 2016.

Respectfully submitted,

**HORAN, WALLACE & HIGGINS, LLP**          **TALENFELD LAW**
*Attorneys for Plaintiff*                              *Attorneys for Plaintiff*
608 Whitehead Street                              Bank of America Plaza
Key West, FL 33040                                1776 N Pine Island Road, Suite 222
Telephone: 305-294-4585                        Fort Lauderdale, Florida  33322
Facsimile: 305-294-7822                         Telephone:     754-888-5437
DAVID P. HORAN                                   Facsimile:     954-644-4848
Florida Bar No. 142474

**By:** / s / Howard M. Talenfeld
          HOWARD M. TALENFELD
          Florida Bar No. 312398
          STACIE J. SCHMERLING
          Florida Bar No. 0083862